**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CARMEN MORGAN-MAPP,** | : | |
| **Administratrix of the Estate of** | : | **CIVIL ACTION** |
| **CASSANDRA MORGAN**, Deceased, | : | |
| **Plaintiff**, | : | |
| | : | |
| **v.** | : | |
| | : | |
| **GEORGE W. HILL CORRECTIONAL** | : | |
| **FACILITY**, et al., | : | **No. 07-2949** |
| **Defendants.** | : | |

<u>**MEMORANDUM AND ORDER**</u>

**Schiller, J.**                                                           **September 12, 2008**

Plaintiff Carmen Morgan-Mapp brings this action as the administratix of her sister, Cassandra Morgan's ("Cassandra"), estate against Defendants Crozer-Chester Medical Center ("CCMC"), Usha Kotihal, M.D., George W. Hill Correctional Facility ("GWHCF"), The Geo Group, Inc., the County of Delaware, the Delaware County Board of Prison Inspectors ("DCBPI"), George W. Hill, Ronald Nardolillo, Ronnie Moore, Connie Danley, William Purner, M.D., Grato Panque, M.D., Hani Zaki, M.D., and John Fraunces, Ed.D.[1]  Plaintiff's claims arise from Cassandra's untimely death on March 29, 2006 due to complications from a thyroid condition for which she was not treated during her five-week incarceration at GWHCF shortly after she was released from involuntary commitment at CCMC.  Plaintiff brings a survival action and wrongful death claim against Dr. Kotihal and CCMC pursuant to Pennsylvania law, alleging that Dr. Kotihal was grossly

---

[1] Plaintiff has withdrawn her claims against Hill and Moore.  (Pl.'s Resp. in Opp'n to the Mots. for Summ. J. of Defs. County of Delaware, the GEO Group, Inc., George W. Hill, GWHCF, DCBPI, Nardolillo, Moore, Danley, Purner, Paneque, Zaki, and Fraunces [hereinafter "Pl.'s Resp. to Prison Defs."] at 25 n.11.)

negligent in prematurely discharging Cassandra from CCMC.[2]  Plaintiff's claim against the other Defendants, brought pursuant to 42 U.S.C. § 1983, alleges that those Defendants violated Cassandra's Fourth, Fifth, Eighth and Fourteenth Amendment rights, primarily based on their deliberate indifference to Cassandra's serious medical needs.[3]  Currently before the Court are Defendants' motions for summary judgment.  For the following reasons, CCMC and Dr. Kotihal's motion is denied, Nardolillo, Moore, Danley, Purner, Paneque, Zaki, and Fraunces's (collectively "Individual Prison Defendants") motion is granted as to Nardolillo and Danley and otherwise denied, The GEO Group, Inc., Hill, GWHCF, and DCBPI's (collectively "Institutional Defendants") motion is denied, and the County of Delaware's motion is granted.

I.      **BACKGROUND**

   A.      **Cassandra is involuntarily committed to CCMC**

   Cassandra Morgan was a thirty-eight year old African-American woman with a lengthy history of paranoid schizophrenia.  (Statement of Undisputed Facts in Support of Mot. for Summ. J. of Defs. CCMC and Kotihal [hereinafter "CCMC SOF"] ¶¶ 1-2; Pl.'s Resp. to CCMC SOF ¶¶ 1-2; Individual Prison Defs.' Statement of Material Undisputed Facts [hereinafter "Individual Prison Defs.' SOF"] ¶¶ 1-2; Pl.'s Resp. to Individual Prison Defs.' SOF ¶¶ 1-2; Statement of Undisputed Facts Submitted by the Institutional Defs. [hereinafter "Institutional Defs.' SOF"] ¶ 1; Pl.'s Resp. to Institutional Defs.' SOF ¶ 1.)  She also suffered from hypothyroidism. (Pl.'s Statement of Facts

_____

   [2] Plaintiff has withdrawn her corporate negligence claim against CCMC.  (Pl.'s Mem. of Law in Opp'n to Mot. for Summ. J. of Defs. CCMC and Usha Kotihal, M.D. at 18 n.2.)

   [3]  Plaintiff has withdrawn her Fourth and Fifth Amendment claims.  (Pl.'s Resp. to Prison Defs. at 7 n.2.)

[hereinafter "Pl.'s SOF"] ¶ 14; Resp. of Defs. CCMC and Kotihal to Pl.'s SOF [hereinafter "CCMC Resp. to Pl.'s SOF"] ¶ 14; Resp. to Pl.'s SOF Submitted by Defs. the GEO Group, Inc., GWHCF, DCBPI, Nardolillo, Danley, Purner, Paneque, Zaki and Frances [hereinafter "Prison Defs.' Resp. to Pl.'s SOF"] ¶ 14.)  Since 2003, Cassandra had been involuntarily committed to CCMC on multiple occasions for exhibiting dangerous behavior, including threatening her siblings, in connection with her paranoid schizophrenia.  (Pl.'s SOF Ex. 21 (Records of Involuntary Commitment).)   After an involuntary commitment from August 27, 2005 to September 8, 2005, Cassandra was discharged from CCMC and assigned to Delaware County's Mobile Assessment Stabilization and Treatment ("MAST") team program for outpatient mental health care, at which point Erin King became her intensive care manager.  (Pl.'s SOF ¶¶ 26-27 & Ex. 21 at 42-43; CCMC Resp. to Pl.'s SOF ¶¶ 26-27.)

In January 2006, Cassandra received a citation for criminal trespassing at a local college and for demanding food from local restaurants without paying.  (Pl.'s SOF Ex. 10 (Erika Morgan Dep.) 167-68 & Ex. 21 at 22-24, 34.)   In addition to threatening employees at local establishments, Cassandra threatened her sisters Erika and Jamie with a broomstick.  (Pl's. SOF Ex. 10 at 168-69 & Ex. 11 (Jamie Morgan Dep.) at 207-208 & Ex. 21 at 22-24.)  She also refused treatment from the MAST team.  (Pl.'s SOF Ex. 21 at 24.)  As a result of these incidents, Cassandra's sisters applied to have her involuntarily committed; a CCMC physician signed the certification, and the petition was granted on January 19, 2006.  (CCMC SOF ¶ 11; Pl.'s Resp. to CCMC SOF ¶ 11; Pl.'s SOF Ex. 21 at 30.) That same day, CCMC filed a petition for further involuntary commitment which was granted, thereby allowing CCMC to treat Cassandra for up to twenty days.  (CCMC SOF ¶ 17; Pl.'s Resp. to CCMC SOF ¶ 17; Pl.'s SOF Ex. 21 at 13-15.)

At CCMC, Cassandra was immediately seen by Dr. Rommel Rivera, a psychiatrist, who diagnosed her as a paranoid schizophrenic in need of psychotropic medication. (CCMC SOF ¶¶ 13-15; Pl.'s Resp. to CCMC SOF ¶¶ 13-15.)  Since Cassandra was refusing medication, Dr. Rivera sought to medicate her against her will, and obtained a second opinion from another psychiatrist, who agreed that Cassandra was in need of forced medication.  (CCMC SOF ¶¶ 14, 16 & Ex. C (CCMC Medical Records) at PS-CCMC1259 & Ex. E (Rivera Dep.) at 25; Pl.'s Resp to CCMC SOF ¶¶ 14, 16.)  On January 20, 2006, Dr. Rivera began the process of referring Cassandra to Norristown State Hospital ("NSH") for long-term psychiatric care and planned to elevate her from the MAST team to the Program of Assertive Community Treatment ("PACT") team, which provides the highest level of outpatient case management in Delaware County.  (CCMC SOF ¶¶ 19-20 & Ex. C at PS-CCMC1263; Pl.'s Resp. to CCMC SOF ¶¶ 19-20.)  Dr. Rivera also treated Cassandra's hypothyroidism with Synthroid.  (Pl.'s SOF Ex. 5 (CCMC Medical Records) at CM64 & Ex. 6 (Rivera Dep.) at 96-97.)  As with her psychiatric medication, Cassandra would sometimes refuse to take her Synthroid.  (CCMC SOF ¶ 43; Pl.'s Resp. to CCMC SOF ¶ 43.)

On January 23, 2006, Margaret "Meg" Burns, a social worker at CCMC, prepared a petition for further involuntary commitment of Cassandra as a prerequisite for transferring her to NSH. (CCMC SOF ¶ 22; Pl.'s Resp. to CCMC SOF ¶ 22.)  The petition stated:

> [Patient] remains non compliant in an [outpatient] setting.  She is at the MAST team level of care and remains unable to successfully maintain self in the community. [Patient] when non compliant becomes floridly psychotic and assaultive to those in the community.

(Pl.'s Ex. 21 at 6.)  The Court of Common Pleas of Delaware County granted the petition on January 27, 2006, thereby allowing CCMC to treat Cassandra for up to ninety days.  (*Id.* at 1.)

4

On January 26, 2006 Meg Burns met with Cassandra and her sisters to discuss placing Cassandra at NSH for extended care.  (CCMC SOF ¶ 26 & Ex. C at PS-CCMC1274; Pl.'s Resp. to CCMC SOF ¶ 26; Pl.'s SOF Ex. 10 at 176-79.)  Cassandra and her sisters agreed that she should be discharged to NSH, and Burns made the referral accordingly — Burns sent a referral packet to NSH and contacted Jill Baldwin, the chronic care coordinator at the Office of Behavioral Health of Delaware County.  (CCMC SOF ¶¶ 27-31 & Ex. C at PS-CCMC1274; Pl.'s Resp. to CCMC SOF ¶¶ 27-31; Pl.'s SOF Ex. 10 at 177.)  The next day, Dr. Rivera saw Cassandra.  Although she exhibited some improvement in that she was taking her medication, she remained "bizarre," "disorganized," "illogical," and "delusional." (CCMC SOF Ex. E at 117; Pl.'s SOF Ex. 5 at CM80.)

### B.        Dr. Kotihal takes over Cassandra's care and discharges her from CCMC

On January 30, 2006, Dr. Kotihal took charge of Cassandra's care at CCMC.  (CCMC SOF ¶ 35; Pl.'s Resp. to CCMC SOF ¶ 35.)  Dr. Kotihal was aware that Dr. Rivera was considering transferring Cassandra to NSH, but she did not discuss Cassandra's care with Dr. Rivera.  (Pl.'s SOF Ex. 8 at 23-25, 61-62.) On February 1, 2006, Dr. Kotihal met with Cassandra for the third time since Cassandra had been placed in her care.  (CCMC SOF ¶¶ 36-38 & Ex. C at PS-CCMC1281; Pl.'s Resp. to CCMC SOF ¶¶ 36-38.)  Dr. Kotihal's notes from that day reflect that "as per Jill [Baldwin], beds are not available at NSH" and that Dr. Kotihal thus planned to "discharge [Cassandra] home when [she] is stable." (CCMC SOF Ex. C at PS-CCMC1281.)  However, Dr. Kotihal testified at her deposition that she did not personally speak to Jill Baldwin regarding the availability of beds at NSH. (Pl.'s SOF ¶ 53; CCMC Resp. to Pl.'s SOF ¶ 53 & Ex. F. (Kotihal Dep.) at 77-78.)   NSH records indicate that beds were, in fact, available at NSH during the relevant time period, but that Delaware County had exceeded its bed cap.  (Pl.'s SOF Ex. 26 (Letter from NSH Director of Social Services).)

5

Irrespectively, NSH can "accommodate any individual who has been referred for inpatient care and has a current commitment," even if the bed cap for a particular county has been reached. (*Id.*)

Dr. Kotihal met with Cassandra again on February 2nd and 3rd. (Pl.'s SOF Ex. 5 at CM88, CM90.) Cassandra was still refusing her psychotropic medication, so she was forcibly medicated. (CCMC SOF ¶¶ 40-41; Pl.'s Resp. to CCMC SOF ¶¶ 40-41.) On February 6th, Dr. Kotihal saw Cassandra again. Kotihal's notes indicate that Cassandra's delusions and paranoia had improved, as had her threatening behavior. (Pl.'s SOF Ex. 5 at CM95, CM128.) After an altercation with Dr. Kotihal, Cassandra even agreed to take an intramuscular injection of long-acting psychotropic medication. (CCMC SOF ¶ 46; Pl.'s Resp. to CCMC SOF ¶ 46.) Although Dr. Kotihal's notes indicate that Cassandra's goals had not been met, Dr. Kotihal believed that Cassandra was no longer a danger to herself or others, and that she was not a candidate for referral to NSH. (Pl.'s SOF Ex. 5 at CM128; CCMC SOF Ex. D (Kotihal Dep.) at 117.) Accordingly, Dr. Kotihal scheduled Cassandra for discharge the next day. (Pl.'s SOF Ex. 5 at CM95.)

In light of Cassandra's upcoming discharge, Meg Burns, the social worker, called Cassandra's sisters "stating that [they] should secure a restraining order and possibly change their locks." (*Id.*; *see also* Pl.'s SOF Ex. 11 at 132-33.) Burns also told Jamie Morgan, one of Cassandra's sisters, that Cassandra was being discharged because Dr. Kotihal would not sign the referral papers for transfer to NSH. (Pl.'s SOF Ex. 11 at 132-33.) Jamie was surprised to learn of the discharge since it was contrary to the prior decision to move Cassandra to NSH. (*Id.*)

Cassandra was discharged from CCMC on February 7, 2006. (Pl.'s SOF Ex. 5 at CM96.) In her discharge summary, Dr. Kotihal reported that prior to discharge Cassandra was "[a]lert, not very cooperative . . . disheveled, upset, [and] angry." (*Id.* at CM38; *see also id.* at CM96-97.) She

6

also reported that Cassandra was "delusional" with an "illogical" thought process, but that Cassandra "denie[d] suicidal or homicidal ideation." (*Id.* at CM38.)  Erin King, Cassandra's intensive care manager for the MAST program, took her home. (*Id.* at CM98.)  King disagreed with Dr. Kotihal's decision to discharge Cassandra but did not consider Cassandra to be a danger to herself or others at that time.  (Pl.'s SOF Ex. 9 (May 12, 2008 King Dep.) at 38, 43; CCMC SOF Ex. H (MAST Program Documentation) at PS-CCMC1831 & Ex. L (Apr. 15, 2008 King Dep.) at 241.) )  King's notes from the date of discharge reflect that Cassandra was "quite psychotic" and that her "insight and judgment [were] horrible."  (CCMC SOF Ex. H at PS-CCMC1831.)  Meg Burns's discharge notes likewise reflect that Cassandra "remain[ed] with psychosis" at that time.  (Pl.'s SOF Ex. 5 at CM98.)

The parties dispute whether Dr. Kotihal prescribed Synthroid for Cassandra at the time of her discharge.  CCMC and Kotihal assert that Cassandra was given a prescription for Synthroid. (CCMC SOF ¶ 53 & Ex. C at PS-CCMC1224).  However, Erin King testified that Dr. Kotihal refused to write the prescription when King requested it, because Cassandra could get it from her primary care physician.  (Pl.'s SOF ¶ 58 & Ex. 9 (May 12, 2008 King Dep.) at 32-35.)  King's discharge notes, however, state that Synthroid "has been newly prescribed," but that Cassandra stated that she would neither take it nor her other medication. (CCMC SOF Ex. H at PS-CCMC1831.)  This was not surprising since Cassandra refused to take her Synthroid on the day she was discharged, as she had every day since February 2nd while she was at CCMC.  (Pl.'s SOF Ex. 8 at 85.)

When King dropped Cassandra off with her sisters on February 7th, Cassandra was confused, disoriented, disheveled, and withdrawn.  (Pl.'s SOF Ex. 10 at 204 & Ex. 11 at 138, 141-42.)  That night, she stayed up screaming until 5:00 in the morning.  (Pl.'s SOF Ex. 11 at 150.)  Over the next

week, Cassandra was destroying her clothes and was throwing away her food because she believed someone was trying to poison herself or her siblings.  (*Id.* at 161-64.)  When King visited Cassandra on February 15, 2006, she noted that Cassandra was "markedly disorganized" and "not taking any meds," but concluded that there was no basis to commit her since Cassandra was "cooperative." (CCMC SOF Ex. H at PS-CCMC1830.)  Accordingly, King sought to refer Cassandra to PACT for more intensive care, and a pre-screening was completed on that date.  (*Id.*; CCMC SOF ¶ 65; Pl.'s Resp. to CCMC SOF ¶ 65.)

### C.  Cassandra is sent to GWHCF for shoplifting

The next day, Cassandra was arrested by the Upper Chichester Police for retail theft, defiant trespass, and disorderly conduct when she attempted to leave a local Wal-Mart without paying for merchandise.  (Pl.'s SOF ¶ 68 & Ex. 28 (Incident Report); CCMC Resp. to Pl.'s SOF ¶ 68; Prison Defs.' Resp. to Pl.'s SOF ¶ 68.)  At the time of the incident, Cassandra was under a delusion that she owned the Wal-Mart.  (Pl.'s SOF ¶ 68 & Ex. 28; CCMC Resp. to Pl.'s SOF ¶ 68; Prison Defs.' Resp. to Pl.'s SOF ¶ 68.)  Cassandra was thereafter arraigned and committed to GWHCF as a pretrial detainee.  (Pl.'s SOF ¶ 71; CCMC Resp. to Pl.'s SOF ¶ 71; Prison Defs.' Resp. to Pl.'s SOF ¶ 71.)

GWHCF is a correctional institution run by the GEO Group pursuant to a contract with DCBPI.  (App. to Mot. for Summ. J. of Defs.' GEO Group, Inc., Hill, GWHCF, and DCBPI [hereinafter "App. to Institutional Defs.' Mot."] Ex. 6 (Correctional Services Contract).)  The GEO Group provides prison services to GWHCF pursuant to this contract, "subject to the control, supervision and participation of the [DCBPI]."  (*Id.* at 371.)  Defendant Nardolillo was the GWHCF warden during Cassandra's incarceration.  (Individual Prison Defs.' SOF ¶ 18; Pl.'s Resp. to the Individual Prison Defs.' SOF ¶ 18.)  Ultimately, Cassandra would remain at GWHCF until March

8

25, 2006, when she collapsed on the floor of her cell and was taken to the hospital.

    **D.**    **Erin King and Cassandra's siblings contact GWHCF regarding Cassandra**

    King and Cassandra's siblings made numerous efforts to contact GWHCF while Cassandra was incarcerated. On the day Cassandra was brought to GWHCF, her sisters informed Erin King of the situation. (Pl.'s SOF Ex. 9 (Apr. 15, 2008 King Dep.) at 261.) King planned to contact the GWHCF mental health liaisons. (*Id.* at 262.) These liaisons are employed by Delaware County to facilitate the release of mentally ill individuals' records to prisons and courts, and to keep track of mentally ill inmates. (Pl.'s SOF Ex. 44 at 44; Individual Prison Defs.' SOF Ex. P (Benson Dep.) at 8, 13-14.) On February 23, 2006, King spoke with Kirk Benson, a GWHCF mental health liaison. (Pl.'s SOF Ex. 8 (MAST Records) at PS-CCMC1828 & Ex. 9 at 263-65.) King informed Benson of Cassandra's behavioral and medication history, and recalls Benson responding that he would share this information with the other mental health liaison at GWHCF to whom Cassandra had been assigned. (Pl.'s SOF Ex. 9 at 265.) Benson, however, has no recollection of this phone call with King. (Individual Prison Defs.' SOF Ex. P at 33-38.) Irrespectively, there is no evidence that any of the doctors or nurses who treated Cassandra spoke with the mental health liaisons regarding Cassandra.

    Additionally, Cassandra's siblings, Erika, Lisa, Jamie, and James Morgan contacted the jail to inquire about their sister. At first, Erika and Lisa contacted Adeliade Evans, whose name Erika acquired from a nephew who formerly worked at GWHCF. (Pl.'s SOF Ex. 10 at 71-80 & Ex. 14 (Lisa Morgan Dep.) at 82-83.) When Ms. Evans did not return their phone calls, they made additional attempts to obtain information about Cassandra. At one point, Lisa Morgan called and was transferred to Connie Danley, the Health Services Administrator at GWHCF. (Pl.'s SOF Ex.

14 at 84-85; Individual Prison Defs.' SOF ¶ 19; Pl.'s Resp. to the Individual Prison Defs.' SOF ¶ 19.)  Lisa left a message for Danley inquiring about her sister's whereabouts, which Danley never returned.  (*Id.* at 84-85, 89.)  When Lisa again called GWHCF, she was transferred to Nikki Dixon.  (*Id.* at 85.)  Ms. Dixon returned Lisa's call, and Lisa informed her that Cassandra suffered from schizophrenia and hypothyroidism.  (*Id.* at 86.)  Likewise, Jamie Morgan spoke with Nikki Dixon and specifically mentioned that her sister suffered from schizophrenia and hypothyroidism.  (Pl.'s SOF Ex. 11 at 246-248, 260, 288.)  James Morgan also spoke with Ms. Dixon regarding his sister and expressed his concern that GWHCF was not capable of handling Cassandra's schizophrenia.  (Pl.'s SOF Ex. 13 (James Morgan Dep.) at 86-87.)  Despite these conversations, there is no evidence that any medical information made its way to the individuals charged with Cassandra's care.

**E.    Cassandra's incarceration at GWHCF**

Upon her arrival at GWHCF, Cassandra swung at a correctional officer and had to be physically restrained.  (Pl.'s SOF ¶ 75 & Ex. 33 (Minor Use of Force Report); Prison Defs.' Resp. to Pl.'s SOF ¶ 75.)  Accordingly, she was brought for an intake screening and mental health screening in handcuffs; the screening was conducted by Lisa Black, a physician's assistant.  (Pl.'s SOF ¶ 77; Prison Defs.' Resp. to Pl.'s SOF ¶ 77.)  Ms. Black noted on the intake form that Cassandra was non-complaint throughout the interview, that she responded "none of your business" when asked if she had previously been hospitalized, and that her "behavior or physical appearance suggest[ed] the risk of suicide or assault on staff or other inmates."  (Pl.'s SOF Ex. 1 (GEO Group Records) at CM724-725.)  Although Cassandra stated that she did not suffer from a psychiatric condition, Black did not believe that Cassandra was being truthful.  (Pl.'s SOF Ex. 34 (Black Dep.) at 139-40.)  Indeed, Black thought that Cassandra suffered from a mental illness or that she was

10

mentally retarded, but "wasn't sure what exactly her diagnosis was because she couldn't tell me." (*Id.* at 96-98.)  Black attempted to perform a physical on Cassandra, but Cassandra refused.  (App. to Institutional Defs.' Mot. Ex. 9 (Black Dep.) at 130-131.)  Accordingly, there was no record of Cassandra's weight or vital signs on intake and no blood was drawn.  (Pl.'s SOF ¶ 96; Prison Defs.' Resp. to Pl.'s SOF ¶ 96.)

Since Black could not ascertain what was wrong with Cassandra, Black opted to house her in the infirmary and placed her on suicide watch so that she would be continuously monitored by nursing staff and checked by a correctional officer every fifteen minutes.  (Institutional Defs.' SOF ¶¶ 29-30; Pl.'s Resp. to Institutional Defs.' SOF ¶¶ 29-30; App. to Institutional Defs.' Mot. Ex. 9 at 62, 85; Pl.'s SOF ¶ 144; Prison Defs.' Resp. to Pl.'s SOF ¶ 144.)  In other words, Cassandra's "treatment plan" was to be put on observation because the prison staff had no information as to her condition.  (Pl.'s SOF Ex. 43 (Purner Dep.) at 59-60.)   Black also referred Cassandra to a psychiatrist.  (Pl.'s SOF Ex. 34 at 98.)

On February 17, 2006, Dr. Paneque, a contract psychiatrist at GWHCF, met with Cassandra. (Institutional Defs.' SOF ¶ 33; Pl.'s Resp. to Institutional Defs.' SOF ¶ 33; Individual Prison Defs.' SOF ¶ 21; Pl.'s Resp. to Individual Prison Defs.' SOF ¶ 21.)  After a fifteen to twenty minute examination, Paneque diagnosed Cassandra with "schizoaffective disorder versus schizophrenia." (Institutional Defs.' SOF ¶¶ 34, 39; Pl.'s Resp. to Institutional Defs.' SOF ¶¶ 34, 39; App. to Institutional Defs.' Mot. Ex. 13 (GEO Progress Notes) at 76.)  Although Cassandra admitted to taking medication in the past, she refused to provide information about her psychiatric history and was generally uncooperative.  (App. to Institutional Defs.' Mot. Ex. 15 (Paneque Dep.) at 20-21; Institutional Defs.' SOF ¶¶ 36-37; Pl.'s Resp. to Institutional Defs.' SOF ¶¶ 36-37.)  Since Paneque

11

did not "see any medical problems that jumped out at [him]," he assumed that she was referring to psychiatric medication. (App. to Institutional Defs.' Mot. Ex. 15 at 68-69.) Cassandra also admitted to having suicidal ideation in the past, but stated that she was not currently experiencing such thoughts. (Institutional Defs.' SOF ¶ 38; Pl.'s Resp. to Institutional Defs.' SOF ¶ 38.) Accordingly, Dr. Paneque prescribed Risperdal, an anti-psychotic medication.   (Institutional Defs.' SOF ¶ 41; Pl.'s Resp. to Institutional Defs.' SOF ¶ 41.) He made no attempt to investigate Cassandra's prior medical history. (Pl.'s SOF Ex. 41 (Paneque Dep.) at 66-68.)

Dr. Paneque met with Cassandra a second time on February 21, 2006.  (Institutional Defs.' SOF ¶ 43; Pl.'s Resp. to Institutional Defs.' SOF ¶ 43.)  During this session, Paneque learned that Cassandra was refusing to take the Risperdal he prescribed.  (Institutional Defs.' SOF ¶¶ 43-44, 46; Pl.'s Resp. to Institutional Defs.' SOF ¶¶ 43-44, 46.)  During their meeting, Cassandra disclosed to that she had been previously hospitalized but did not indicate where.  (Pl.'s SOF Ex. 1 at CM767.) Dr. Paneque did not try to ascertain records of prior hospitalizations, however, and merely encouraged Cassandra to take her medications.  (Institutional Defs.' SOF ¶ 48; Pl.'s Resp. to Institutional Defs.' SOF ¶ 48.)

On March 2, 2006, Cassandra was examined by Dr. Zaki, another contract psychiatrist at GWHCF.   (Institutional Defs.' SOF ¶ 38; Pl.'s Resp. to Institutional Defs.' SOF ¶ 38; Individual Prison Defs.' SOF ¶ 20; Pl.'s Resp. to Individual Prison Defs.' SOF ¶ 20; Pl.'s SOF Ex. 47 at 24-25; App. to Institutional Defs.' Mot. Ex. 20 at 12.)  During this meeting, Zaki noted that Cassandra denied having hallucinations despite the fact that she was clearly responding to internal stimuli. (App. to Institutional Defs.' Mot. Ex. 20 at 12.)  Although he was aware that Cassandra was not taking her Risperdal, he increased her dosage in hopes that "she would come around." (*Id.* at 12, 20;

Pl.'s SOF Ex. 1 at CM767.)  This was Cassandra's only meeting with Dr. Zaki; he did not plan for

any follow-up.  (Pl.'s Ex. 47 at 9.)

Dr. Fraunces, a contract psychologist at GWHCF, met with Cassandra on March 6, 2006 in

response to a request from the nursing staff, who felt that Cassandra was angry and hostile.

(Individual Prison Defs.' SOF ¶¶ 23, 94; Pl.'s Resp. to Individual Prison Defs.' SOF ¶¶ 23, 94; Pl.'s

SOF ¶ 111; Prison Defs.' Resp. to Pl.'s SOF ¶ 111.)   After a five minute meeting, Fraunces

concluded that Cassandra was nothing more than a "typical noncompliant paranoid schizophrenic."

(Individual Prison Defs.' SOF ¶¶ 92-93; Pl.'s Resp. to Individual Prison Defs.' SOF ¶¶ 92-93; Pl.'s

SOF ¶ 111 & Ex. 46 (Fraunces Dep.) at 11-12; Prison Defs.' Resp. to Pl.'s SOF ¶ 111.)  He reported

that Cassandra said she was diagnosed as a paranoid schizophrenic years ago, and that she said she

had not been on medication for sometime and was not in need of it then.  (Pl.'s SOF Ex. 1 at CM

767.)  He did not review Cassandra's intake records at that time nor did he attempt to ascertain any

medical history.[4]  (Pl.'s Ex. 1 at CM725 & Ex. 46 at 12.)

On March 15, 2006, Dr. Paneque again met with Cassandra for fifteen to twenty minutes.

(Institutional Defs.' SOF ¶ 60; Pl.'s Resp. to Institutional Defs.' SOF ¶ 60.)  Dr. Paneque observed

that Cassandra was withdrawn and delusional, among other things, and that she stated that she was

taking her medication despite the nursing staff's assertions otherwise.  (App. to Institutional Defs.'

Mot. Ex. 15 at 150.)  Accordingly, he continued to encourage medication compliance, but he did not

_____

[4] On March 27, 2006, after Cassandra had collapsed, Fraunces reviewed Cassandra's intake form and signed it.  (Pl.'s Ex. 46 at 23.)  Fraunces testified at his deposition that, in general, he is required to review the charts of inmates with mental health issues within seven days of intake.  (*Id.*)  However, since Cassandra was immediately sent to the infirmary, Fraunces testified that his review was merely a "formality" since she had already been seen by the psychiatrist.  (*Id.*)

schedule a follow up appointment.  (*Id.*)  This is the last time Cassandra was seen by a physician before she collapsed on March 25th.

None of the doctors ever investigated Cassandra's medical history, nor was a second attempt made to give Cassandra a physical.[5]  (Pl.'s SOF ¶¶ 146, 231 & Ex. 1 & Ex. 43 at 59-60 & Ex. 44 (Danley Dep.) at 147-48; Prison Defs.' Resp. to Pl.'s SOF ¶¶ 146, 231.)  Accordingly, the sole source of medical history remained Cassandra herself, who was noncompliant and psychotic on intake.  (Pl.'s SOF ¶ 125 & Ex. 31 (Mar. 12, 2008 Kroger Dep.) at 62; Prison Defs.' Resp. to Pl.'s SOF ¶ 125.)   Additionally, no specific written treatment plan was ever prepared for Cassandra. (Pl.'s SOF Ex. 41 at 88-89.)  Her treatment was limited to monitoring by nursing staff, the previously discussed doctors visits, and psychotropic medication that she was encouraged to take (although the doctors were aware that she was not doing so).  (Pl.'s SOF Ex. 41 at 88-89 & Ex. 43 at 24, 58 & Ex. 46 at 23-24 &Ex. 47 at 18; Pl.'s SOF ¶ 223; Prison Defs.' Resp. to Pl.'s SOF ¶ 223.)

## F.    Cassandra's behavior in the infirmary

While she was housed in the infirmary, Cassandra exhibited hostile, agitated, and violent behavior. (Pl.'s SOF ¶¶ 194, 197; Prison Defs.' Resp. to Pl.'s SOF ¶¶ 194, 197.)  She would occasionally bang on the glass of her cell and at times was so aggressive that her physical assessment and vital signs were deferred for security reasons.  (Pl.'s SOF ¶¶ 198-201 & Ex. 1; Prison Defs.' Resp. to Pl.'s SOF ¶¶ 198-201.)  Indeed, her vital signs were never consistently recorded — over the

_____

[5] Although GWHCF had a policy whereby the facility could obtain a release from an inmate in order to obtain prior medical records, no policy existed for obtaining such records when an inmate lacked capacity to consent.  (Pl.'s SOF Ex. 43 at 57.)  However, it appears that the mental health liaisons were capable of facilitating the sharing of such information, but that no efforts were made by prison staff to coordinate.  Furthermore, Ronnie Moore, the Health Services Administrator at GWHCF since March 20, 2006, acknowledged that the information would be fairly easy to ascertain with some effort.  (Pl.'s SOF Ex. 42 (Moore Dep.) at 64.)

course of seventy-eight nursing shifts, Cassandra's vital signs were taken only seventeen times because she refused to have them taken or because they were deferred due to her behavior.  (Pl.'s SOF ¶¶ 246-247 & Ex. 1 at 729-32, 737-42, 744, 746-54, 757, 760-63, 765-66, 768-74, 776-83, 785, 787, 789, 791, 794 & Ex. 45 at 52;  Prison Defs.' Resp. to Pl.'s SOF ¶¶ 246-247.)  She also consistently refused her medication and sometimes refused to eat.  (Pl.'s SOF ¶ 220 & Ex. 1; Prison Defs.' Resp. to Pl.'s SOF ¶ 220.)  At other times, however, she was nonresponsive and withdrawn. (Pl.'s SOF ¶ 238 & Ex. 1 at 732, 752; Prison Defs.' Resp. to Pl.'s SOF ¶ 238.)

Two of the nurses who had been monitoring Cassandra vacillated on whether she was a candidate for involuntary commitment, however, there is no evidence that they communicated their impressions to the doctors charged with Cassandra's care.  (Pl.'s SOF ¶ 211 & Ex. 45 (Hoffman Dep.) at 62-67, 112 & Ex. 60 at 2202; Prison Defs.' Resp. to Pl.'s SOF ¶ 211.)  However, the psychiatrists at GWHCF would review the charts, where these impressions were documented, when assigned to a patient in order to better treat that patient.  (Pl.'s SOF ¶ 115; Prison Defs.' Resp. to Pl.'s SOF ¶ 115; Pl.'s SOF Ex. 41 at 16-17, 96 & Ex. 47 (Zaki Dep.) at 14 & Ex. 60 at 2202, 3276.) Accordingly, Drs. Paneque and Zaki presumably were aware of the information contained the infirmary logs and infirmary progress records when they treated Cassandra.  However, Paneque and Zaki both testified that at the time they treated Cassandra they did not believe that she was an imminent danger to herself or others such that forced medication was warranted.   (App. to Institutional Defs.' Mot. Ex. 15 (Paneque Dep.) at 83-84 & Ex. 20 (Zaki Dep.) at 64-67.)  Dr. Zaki further testified, however, that he never considered committing Cassandra, but upon review of the nurses' notes admitted that he should have committed her.  (Pl.'s SOF Ex. 47 at 43, 64-69.)

By March 21st, one of the nurses noted that Cassandra's "continued decompensation" should

15

be reported to a psychiatrist.  (Pl.'s SOF Ex. 1 at CM734.)  There is no evidence, however, of any such communications to Drs. Paneque or Zaki, or to any other doctor.  (Pl.'s SOF ¶ 241; Prison Defs.' Resp. to Pl.'s SOF ¶ 241.) That same date, Cassandra had a temperature of 92.7 degrees.[6] (Pl.'s SOF Ex. 1 at 734 & Ex. 60 (Infirmary Logs) at 2237.)  Although a nurse would be required to report such a low temperature to a physician, this was not done in Cassandra's case.  (Pl.'s SOF ¶ 245; Prison Defs.' Resp. to Pl.'s SOF ¶ 245.) Cassandra had a low temperature again on March 22nd, but it appears this temperature was also not reported to a physician.  (Pl.'s SOF ¶ 250 & Ex. 1 at CM733; Prison Defs.' Resp. to Pl.'s SOF ¶ 250.)  Such low temperatures are a symptom of hypothermia and hypothyroidism.

Dr. Purner, a contract physician at GWHCF, was listed as Cassandra's physician on GWHCF's records for the dates of March 21st, March 22nd and March 25th on GWHCF's records. (Individual Prison Defs.' SOF ¶ 22; Pl.'s Resp. to Individual Prison Defs.' SOF ¶ 22; Pl.'s SOF Ex. 1 at CM728, CM733-734.)  Dr. Purner never evaluated Cassandra while she was at GWHCF, nor is there any evidence that he reviewed Cassandra's charts.  (Individual Prison Defs.' SOF ¶ 87; Pl.'s Resp. to Individual Prison Defs.' SOF ¶ 87.)  However, there is also no evidence that the nurses on duty reported Cassandra's symptoms to Dr. Purner.  (Pl.'s SOF Ex. 43 at 27-28.)

G.   **Cassandra collapses and is brought to the hospital**

On the morning of March 25, 2006, Correctional Officer Rasheeda Hackett observed Cassandra holding the sink with her legs shaking.  (Pl.'s SOF ¶ 259; Prison Defs.' Resp. to Pl.'s SOF

---

[6] Nurse Hoffman, who took the reading, testified at her deposition that this was a "transcription error."  (Prison Defs.' Resp. to Pl.'s SOF ¶ 243; App. to Institutional Def.s' Mot. Ex. 14 (Hoffman Dep.) at 127.)  At this stage in the proceedings, however, this fact must be taken in favor of the Plaintiff.

¶ 259.)  Officer Hackett informed Nurse Miriam Byrd that Cassandra needed medical assistance. (Pl.'s SOF Ex. 62 (Hackett Dep.) at 35-36.)    Shortly thereafter, both Hackett and the officer at master control observed that Cassandra had fallen and a "man down" alert was called at 3:15 a.m. (Pl.'s SOF ¶ 278; Prison Defs.' Resp. to Pl.'s SOF ¶ 278; CCMC SOF Ex. X (Hackett Dep.) at 39.) Nurse Byrd arrived at the cell and observed Cassandra in a semi-conscious experiencing a seizure on the floor.  (Pl.'s SOF ¶ 264 & Ex. 50 (Byrd Dep.) at 73-74;  Prison Defs.' Resp. to Pl.'s SOF ¶ 264.)

When Cassandra stopped seizing, Lisa Black, who responded to the "man down" alert, placed Cassandra on a stretcher to observe her, examine her, and take her vital signs.  (Pl.'s SOF Ex. 34 at 148.)  No one took Cassandra's temperature at the time, although a rectal temperature could have been taken.  (Pl.'s SOF Ex. 50 at 90.)  Additionally, Black wrote a prescription for Dilantin, an anti-convulsant.  (Pl.'s SOF Ex. 1 at CM727.)  Around 4:15 a.m., Cassandra's pupils stopped responding to light.  (Pl.'s SOF ¶ 277 & Ex. 1 at CM764; Prison Defs.' Resp. to Pl.'s SOF ¶ 277.)  Accordingly, Black and Byrd decided to call 911.   (Pl.'s SOF Ex. 34 at 149-150.)  Emergency Medical Services records indicate that the call occurred at 4:42 a.m, and a GEO incident report reflects that the ambulance arrived at 4:51.  (Pl.'s SOF Ex. 69 (Incident Report) & Ex. 70 (EMS records).)

Upon arrival at the hospital, Cassandra had a temperature of 82.8 degrees.  (Pl.'s SOF Ex. 71 (Hospital Records) at 455.)  The hospital records reflect that Cassandra had been in prison and that the "prison [was] unaware of history pt [patient] on arrival to prison [because Cassandra was a] poor historian."  (*Id.* at 466.)  Hospital staff obtained Cassandra's medical history from one of her sisters at 1:20 p.m. on March 26th, at which point they learned of Cassandra's thyroid condition.  (*Id.* at 378.)  Dr. Purner, who treated Cassandra at the hospital, was able to access Cassandra's medical

records from CCMC after learning from her sisters that she had been previously hospitalized there. (Pl.'s SOF ¶ 135 & Ex. 43 at 44; Prison Defs.' Resp. to Pl.'s SOF ¶ 135.)  Treatment for Cassandra's thyroid condition was administered accordingly.  (Pl.'s SOF Ex. 43 at 45.)

A blood test revealed that Cassandra's thyroid stimulating hormone was over fourteen times normal levels.  (*Id.* at 48-49.)  Cassandra was seen by an endocrinologist, who opined that she developed myxedema coma in connection with her hypothyroidism.  (Pl.'s SOF ¶ 295 & Ex. 71 CM686; Prison Defs.' Resp. to Pl.'s SOF ¶ 295.)  Ultimately, Cassandra never regained consciousness and passed away on March 29, 2006 after her family decided to remove life support. (Pl.'s SOF Ex. 71 at CM686.)  The medical examiner concluded that Cassandra's cause of death was "sequelae of seizure activity due to profound hypothyroidism, with probable myxedema coma."[7] (Pl.'s SOF Ex. 3 (Postmortem Report) at 7.)

### H.    GEO Group policies

The GEO Group, which runs GWHCF, has several policies that govern the medical care of inmates and detainees.  GEO Group policy 501 requires an immediate intake screening for every individual arriving at GWHCF "[t]o promptly identify and meet the immediate needs of any inmate or pretrial detainee arriving at [GWHCF] who has a physical/mental condition requiring immediate or continuing care," and requires immediate referral of mentally unstable individuals for care.  (Pl.'s SOF Ex. 37 (GEO Policy No. 501) at 271-72.)  Additionally, GEO Group policy 504 requires that each inmate receive a comprehensive health assessment within fourteen days of his or her arrival, which would include "[r]eview of the Receiving Screening," "[c]ollection of additional data to complete the medical, dental, and mental health histories," and "[r]ecording of height, weight, and

---

[7] Defendants dispute that Cassandra died as a result of myxedema coma.

vital signs." (Pl.'s SOF Ex. 37 (GEO Policy No. 504) at 279-81.)  At GWHCF, the mental health assessment is conducted at the same time as the intake screening.  (Pl.'s SOF ¶ 84 & Ex. 31 (Mar. 12, 2008 Kroger Dep.) at 35-37; Prison Defs.' Resp. to Pl.'s SOF ¶ 84.)  The primary reason for this practice is because many individuals incarcerated at GWHCF are coming off the street with no medical records, in contrast with those who are transferred from another facility.  (Pl.'s Ex. 31 (Mar. 12, 2008 Kroger Dep.) at 35-37, 46-47.)  However, the inmate herself is the sole source of her medical history.  (*Id.* at 62.)  Whether an inmate or detainee requires follow-up care is first determined by the initial screener.  (Pl.'s SOF ¶¶ 86-87; Prison Defs.' Resp. to Pl.'s SOF ¶¶ 86-87.)

An inmate or pretrial detainee at GWHCF has a right to refuse health evaluations and treatments.  (Pl.'s SOF Ex. 37 (GEO Group Policy No. 902) at 340-41.)  Pursuant to GEO Group Policy 902, however, any inmate or detainee who exercises this right must sign a refusal form.  (*Id.*)  Although Cassandra refused a physical on intake, consistently refused to let nurses take her vital signs, and constantly refused medication, refusal forms were not prepared on these occasions as required by GEO Group policy.[8]  (Pl.'s SOF ¶¶ 93, 150, 167, 225; Prison Defs.' Resp. to Pl.'s SOF

---

[8] The purpose of the policy requiring documentation of refusals is, in part, to give the patient information about what he is refusing and informing him of the dangers of noncompliance.  (Pl.'s SOF Ex. 31 at 160-161.)  Of course, since Cassandra lacked capacity to understand the consequences of her decisions, the need for refusal forms in her case is questionable.

There are other deficiencies in GWHCF's records, however.  Defendants have been unable to locate Cassandra's suicide watch logs for March 23rd and 24th.  (Pl.'s SOF ¶ 148; Prison Defs.' Resp. to Pl.'s SOF ¶ 148.)  The watch log for March 25th was initially missing, although a copy was reportedly found by Correctional Officer Blocker, who was on duty that night, in her basement shortly before the close of discovery (Plaintiff understandably disputes the authenticity of this log). (Pl.'s SOF Ex. 56 (Blocker Dep.) at 40-41.)  Defendants have also been unable to locate Cassandra's Medical Administration Record, which would illustrate which  medications Cassandra was administered and which she refused, for the entire month of March 2006.  (Pl.'s SOF ¶ 150; Prison Defs.' Resp. to Pl.'s SOF ¶ 150.)

¶¶ 93, 150, 167, 225.)  No GEO Group Policy requires prison staff to seek out additional sources of information when an inmate or detainee is uncooperative due to mental incapacity.  (Pl.'s SOF Ex. 31 (Apr. 12, 2008 Kroger Dep.) at 91-92 & Ex. 43 at 57.)  If an inmate or detainee is incapable of consenting to a physical, however, GWHCF can seek a court order requiring such an examination. (Pl.'s SOF Ex. 43 at 72-73 ("we would examine them because it's a threat to their life if they are unable [to consent].").)

GEO Group Policy 107.2 permits forced administration of psychotropic medications for inmates or detainees who present "an immediate threat to themselves or others," when less restrictive measures "have been found to be ineffective or inadequate by the treating physician or psychiatrist." (Pl.'s SOF Ex. 37 (GEO Group Policy No. 107.2) at 1681a-1682.)  The policy encourages staff to persuade inmates who refuse their psychotropic medication to reconsider and, if such efforts are unsuccessful, to refer them to a psychiatrist and monitor their behavior in the meantime.  (*Id.*)

Inmates who have special needs, including serious mental health conditions, are required to have a special needs treatment plan, to be completed within thirty days of intake.  (Pl.'s SOF Ex. 37 (GEO Group Policy No. 701) at 297-98.)  The GEO Group also has a policy requiring continuity of health care for inmates which states in part: "[u]pon admission to the Facility, inquiry will be made into the inmate's health status from the previous health care provider to include acute and chronic illnesses when appropriate.  Inmates identified as having long-term, potentially serious medical or mental health conditions . . . will be initially evaluated by the Facility primary care provider and referred to appropriate consultant clinics or other community treatment resources as medically indicated."  (Pl.'s SOF Ex. 37 (GEO Group Policy No. 510) at 2036-2038.)

## II.      STANDARD OF REVIEW

Summary judgment is appropriate when the admissible evidence fails to demonstrate a dispute of material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  When the moving party does not bear the burden of persuasion at trial, it may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry its burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  Thereafter, the nonmoving party demonstrates a genuine issue of material fact if sufficient evidence is provided to allow a reasonable finder of fact to find for the nonmoving party at trial.  *Anderson*, 477 U.S. at 248.  In reviewing the record, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor."  *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994). Furthermore, a court may not make credibility determinations or weigh the evidence in making its determination.  *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

## III.     DISCUSSION

### A.      CCMC and Dr. Kotihal

#### 1.      *Gross Negligence*

The Pennsylvania Mental Health Procedures Act affords immunity from civil liability to physicians and facilities who treat involuntarily-committed, mentally ill individuals absent "willful misconduct or gross negligence."  50 PA. CONS. STAT. ANN. § 7114 (2008).  Gross negligence constitutes "a form of negligence where the facts support substantially more than ordinary

carelessness, inadvertence, laxity, or indifference.  The behavior of the defendant must be flagrant, grossly deviating from the standard of care." *Bloom v. Dubois Regional Med. Ctr.*, 597 A.2d 671, 679 (Pa. Super. Ct. 1991); *see also Albright v. Abington Memorial Hosp.*, 696 A.2d 1159, 1164 (Pa. 1997).  "[W]hether an act or failure to act constitutes negligence, of any degree, in view of all the evidence has always been particularly committed to determination by a jury," and may only be determined as a matter of law where "the case is entirely free from doubt." *Bloom*, 597 A.2d at 679-80.

A reasonable jury could conclude that Dr. Kotihal's premature discharge of Cassandra from CCMC was grossly negligent.  Under Dr. Rivera's care, Cassandra was scheduled to be transferred to NSH for long-term psychiatric care (a plan with which Cassandra and her family agreed).  Once Dr. Kotihal took over, she changed Cassandra's treatment plan.  Kotihal discharged Cassandra despite the fact that beds may have been available at NSH, and even though she was aware that Cassandra had not met her treatment goals, remained psychotic, and refused medication.  Additionally, Plaintiff's expert opines that Dr. Kotihal's treatment of Cassandra grossly deviated from the proper standard of care.  (Pl.'s SOF Ex. 25 (Fine Expert Report).)  Furthermore, if a jury concludes that Dr. Kotihal refused to write Cassandra a prescription for Synthroid, such a finding could contribute to a conclusion that she was grossly negligent.  Consequently, summary judgment is unwarranted on Plaintiff's gross negligence claim.[9]  *See DeJesus v. U.S. Dep't of Veterans Affairs*, 479 F.3d 271 (3d Cir. 2007) (affirming district court's conclusion that defendant-hospital was grossly negligent in discharging a patient who exhibited dangerous behavior).

---

[9] Since Dr. Kotihal was on CCMC's medical staff at the time, CCMC is vicariously liable for her conduct.

2.       *Causation and foreseeability*

A plaintiff must also prove that the defendant's gross negligence was a substantial factor, and thus the legal cause, of her harm.  *Ford v. Jeffries*, 379 A.2d 111, 114 (Pa. 1977); *see also* RESTATEMENT (SECOND) OF TORTS §§ 431, 433 (1965).  If a defendant's conduct "is a substantial factor in bringing about harm to another, the fact that the [defendant] neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent him from being liable." RESTATEMENT (SECOND) OF TORTS § 435.  "[W]here an intervening act is wrongful[,] it does not become a superseding cause unless, looking retrospectively from the harm through the sequence of events by which it was produced, it is so extraordinary as not to have been reasonably foreseeable." *Trude v. Martin*, 660 A.2d 626, 627 (Pa. Super. Ct. 1995) (*quoting Vattimo v. Lower Bucks Hosp., Inc.*, 465 A.2d 1231, 1237 (Pa. 1983)).

A reasonable jury could conclude that Dr. Kotihal's decision to discharge Cassandra was a substantial factor in causing her harm, since that decision set in motion a course of events ultimately leading to Cassandra's death.  Furthermore, a reasonable jury could conclude that Cassandra's arrest, incarceration, and ultimate death due to non-treatment of her hypothyroidism was a foreseeable consequence of Dr. Kotihal's decision to discharge Cassandra.  Cassandra was involuntarily committed to CCMC in January 2006, in part, because she was trespassing and threatening employees at a local establishments, which led to run-ins with local law enforcement.  Furthermore, Cassandra was non-compliant with her Synthroid the day of, and during the week before, her discharge, and was generally uncooperative the day of her discharge.  A reasonable jury could conclude then, that it was foreseeable that Cassandra would, as a result of her mental incapacity, commit a petty offense at a local store, and/or that she would fail to take medication.  Furthermore,

since the harm which befell Cassandra could foreseeably result from Dr. Kotihal's alleged gross negligence, any negligence of the other Defendants is not a superseding cause as a matter of law. Accordingly, CCMC and Dr. Kotihal's motion for summary judgment is denied.

### B.    The Individual Prison Defendants

#### 1.    Defendants Paneque, Zaki, Fraunces and Purner

Since Cassandra was a pretrial detainee while incarcerated at GWHCF, her constitutional claim, brought pursuant to 42 U.S.C. § 1983, is properly analyzed under the Fourteenth Amendment.[10]   *City of Revere*, 463 U.S. at 244.   The proper inquiry is therefore whether her treatment at GWHCF amounted to punishment prior to an adjudication of guilt, or whether her treatment was, instead, merely an incident of some other legitimate governmental purpose. *Hubbard v. Taylor*, 399 F.3d 150, 158-59 (3d Cir. 2005).   In the context of medical care, a defendant's acts or omissions exhibiting deliberate indifference to a detainee's serious medical needs equate to punishment in violation of the Fourteenth Amendment. *Id.* at 166 n.22; *Boring v. Kozakiewicz*, 833 F.3d 468, 472-73 (3d Cir. 1987); *Hojnowski v. PrimeCare Med.*, Civ. A. No. 06-1228, 2008 WL 2579708, at *6 n.68 (E.D. Pa. June 27, 2008).   However, neither the Supreme Court nor the Third Circuit have yet defined the exact contours of this Fourteenth Amendment right.

As pretrial detainees are afforded at least the protections afforded to convicted prisoners under the Eighth Amendment, the Eighth Amendment informs, but does not control, the analysis as to pretrial detainees. *Hubbard*, 399 F.3d at 166; *Kost v. Kozakiewicz*, 1 F.3d 176, 188 n.10 (3d Cir. 1993); *Hojnowski*, 2008 WL 2579708, at *6 n.68.   Under the Eighth Amendment, deliberate

---

[10] The Eighth Amendment only applies after an individual has been convicted.  *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983).  Accordingly, since Cassandra was never convicted, Plaintiff's Eighth Amendment claim is dismissed.

indifference to a serious medical need is a subjective standard, requiring a defendant to have actual knowledge of an inmate's serious medical needs. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Therefore, the standard governing pretrial detainees must be somewhat less than the high standard articulated in *Farmer*. It is also clear, however, that "mere negligence or inadvertence in failing to provide adequate medical care," akin to medical malpractice, will not support a constitutional claim. *Hojnowski*, 2008 WL 2579708, at *7. Accordingly, deliberate indifference to a pretrial detainee's right to receive care for serious medical needs is similar to recklessness — Plaintiff must illustrate that the Individual Prison Defendants knew or should have known of her serious medical need and that they acted in conscious disregard of that need. *See Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1024-25 (3d Cir. 1991) (applying "knew or should have known" standard to claim that defendants failed to prevent pretrial detainee's suicide); *see also Woloszyn v. County of Lawrence*, 396 F.3d 314, 321 (3d Cir. 2005) (recognizing "should have known" standard articulated in *Colburn*); *Weyant v. Okst*, 101 F.3d 845, 856-57 (2d Cir. 1996) (where pretrial detainee alleged denial of treatment, defendants "conduct may have been deliberately indifferent if it was reckless though not intentional"). This standard "connotes something more than a negligent failure to appreciate the risk . . . presented by the particular detainee, though something less than subjective appreciation of that risk." *Colburn*, 946 F.2d at 1025.

Here, a jury could conclude that Paneque, Zaki, Fraunces and Purner (collectively "Prison Doctors") were deliberately indifferent to her serious medical needs.[11] Plaintiff has produced evidence that the Prison Doctors and the nurses responsible for treating and monitoring Cassandra failed to coordinate her care and failed to ascertain basic medical information from Cassandra, such

---

[11] The parties do not dispute that Cassandra's medical needs were serious.

as her vital signs.  A jury could conclude that any doctor charged with Cassandra's care would have been aware of the substantial risk that any medical conditions she had would be missed, since a review of her chart reveals that her vital signs were infrequently taken.  This is especially true since Cassandra's psychotic state rendered her incapable of communicating her medical history, a fact of which the Prison Doctors, with the possible exception of Purner, were well aware.  Nevertheless, no one made any effort to ascertain Cassandra's medical history from other sources, even though the reason she was being housed in the infirmary was because no one knew what was wrong with her.

Furthermore, the psychiatrists only continued to encourage medication compliance, despite the fact that Cassandra was noncompliant and decompensating throughout her five week stay, and do not appear to have considered any other options, such as transfer to a more appropriate facility.  They also failed to prepare a written treatment plan for Cassandra, as required by GEO Group policy.  Taking all of the evidence into consideration, a reasonable jury could conclude that the Prison Doctors were deliberately indifferent to Cassandra's serious medical needs.  Accordingly, their motion for summary judgment is denied.  *See Liscio v. Warren*, 901 F.2d 274 (2d Cir. 1990) (summary judgment inappropriate because a jury could find that prison doctor who failed to identify detainee's condition despite existence of symptoms, and where detainee was "poor historian" of his medical history, acted with deliberate indifference).

2.      *Defendants Nardolillo and Danley*

Plaintiff's claims against Ronald Nardolillo, the GWHCF warden, and Connie Danley, GWHCF's Health Services Administrator, are based on supervisory liability.  Supervisory liability is appropriate against a defendant who acts in a policy-making or supervisory role where that defendant, "'with deliberate indifference to the consequences, established and maintained a policy,

practice or custom which directly caused [the] constitutional harm.'" *A.M. ex rel. J.M.K. v. Luzerne County Juvenile Detention Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (*quoting Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 725 (3d Cir. 1989)); *see also Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989).  A supervisor may also be liable under Section 1983 "if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his [or her] subordinates' violations." *Luzerne*, 372 F.3d at 586.

There is no evidence that Warden Nardolillo had policy-making authority nor any evidence that he had any involvement in Cassandra's treatment.  His testimony, on which Plaintiff relies, only establishes that he was responsible for *enforcing* GWHCF's corporate policies and procedures.  (Pl.'s SOF Ex. 58 (Nardolillo Dep.) at 46; Individual Prison Defs.' SOF Ex. G (Nardollilo Dep.) at 41-42.)  Likewise, as Health Services Administrator, Danley was responsible for enforcement of GWHCF medical policies.  (Individual Prison Defs.' SOF Ex. G at 42.)  Furthermore, the fact that Lisa Morgan left a voicemail for Danley, stating that she, Lisa, was "trying to locate [her] sister within the facility," (Pl.'s Mot. Ex. 14 at 89) cannot, as a matter of law, support a finding of supervisory liability on grounds that Danley "participated in violating [Cassandra's] rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in [her] subordinates violations." *Luzerne*, 372 F.3d at 586.  Accordingly, summary judgment is granted as to Nardolillo and Danley.

### 3.    *The Individual Prison Defendants' affirmative defenses*

The Individual Prison Defendants also assert that they are entitled to either qualified immunity or good faith immunity.  Since the Individual Prison Defendants are employed by a private entity, they are not entitled to a qualified immunity defense. *Richardson v. McKnight*, 521 U.S. 399,

412 (1997) ("[W]e must conclude that private prison guards, unlike those who work directly for the government, do not enjoy immunity from suit in a § 1983 case.").  Without deciding whether a "good faith" defense is available in this context, it is clear that "good faith" requires a subjective inquiry into the Individual Prison Defendants' states of mind, making summary judgment on that defense inappropriate.  *See Wolfe v. Horn*, 130 F. Supp. 2d 648, 659 (E.D. Pa. 2001); *see also Pearson v. City of Phila.*, Civ. A. No. 97-1298, 1998 WL 721076, at *2 (E.D. Pa. Oct. 15, 1998).

### C.      The Institutional Defendants

When a government entity contracts with a private entity for correctional services, both entities are liable under Section 1983 if an institutional policy or custom causes a violation of a plaintiff's constitutional rights.  *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990) (policy or custom required to establish Section 1983 liability of government agency); *Andrews v. Camden County*, 95 F. Supp. 2d 217, 228 (D.N.J. 2000) (government entity that contracts for prison health services is still responsible for constitutional violations); *McCullum v. City of Phila.*, Civ. A. No. 98-5858, 1999 WL 493696, at *2 (E.D. Pa. July 13, 1999) (private contractors who run prisons act under color of state law for purposes of Section 1983).  When a policymaker has failed to act, liability is appropriate if "the need to take some action . . . is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need."  *Natale v. Camden County Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003) (internal quotations omitted); *see also City of Canton v. Harris*, 489 U.S. 378, 390 (1989).  Deliberate indifference in this context "is a stringent standard of fault, requiring that a municipal actor disregarded a known or obvious consequence of his action."  *Bd. of County Comm's of Bryan County v. Brown*, 520 U.S. 397, 410 (1997).

28

There is a genuine issue of fact here as to whether it was obvious that serious medical needs of mentally ill detainees such as Cassandra, who was clearly incompetent and incapable of conveying crucial medical information, would go untreated.  Cassandra's hypothyroidism went undetected and thus untreated during the five weeks she spent at GWHCF because she was  incapable of communicating her medical needs.  She was housed in the infirmary on intake so that the prison staff could ascertain more information about her medical condition, but her vital signs were rarely taken and no one contacted her family or made efforts to coordinate with the mental health liaisons at the jail.  Indeed, there is no GEO Group policy that requires prison staff to seek out such information for inmates who are mentally incapacitated.  Furthermore, that individuals at GWHCF in fact received information pertaining to Cassandra's conditions, but that this information never made its way to the doctors and nurses responsible for Cassandra's care, suggests a systematic deficiency.  Taking the facts in a light most favorable to Plaintiff, a reasonable jury could find that the Institutional Defendants' failure to establish policies to address the medical needs of individuals such as Cassandra, who was delusional, non-compliant, and could not "speak for herself" because of her chronic mental illness, constitutes deliberate indifference.  *See Natale*, 318 F.3d at 584 (summary judgment not appropriate where a jury could infer that "the failure to establish a more responsive policy [to inmates and detainees medical needs] caused the specific constitutional violation of which [plaintiffs] complain").  Accordingly, summary judgment is denied as to the Institutional Defendants.

### D.    The County of Delaware

Plaintiff asserts that "the liability of the County of Delaware . . . [stems] from its relationship with the GEO Group, Inc., which it hired to administer the health care programs at the prison." (Pl.'s Resp. to Prison Defs. at 24 n.10.)  Since control of jails and county prisons in Delaware County is

vested in the DCBPI, the County of Delaware is not a proper governmental defendant. (App. to Institutional Defs.' Mot. Ex. 6 at 477 (the contract for management of GWHCF is between the GEO Group and DCBPI).) Accordingly, the County of Delaware's motion for summary judgment is granted. *See Pierson v. Members of the Delaware County*, Civ. A. No. 99-3935, 2000 WL 486608, at *3 (E.D. Pa. Apr. 25, 2000); *see also Peck v. Delaware County Bd. of Prison Inspectors*, 814 A.2d 185, 191 (Pa. 2002).

## IV.    CONCLUSION

Based on the above, summary judgment is denied as to all Defendants except Danley, Nardolillo, and the County of Delaware. An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CARMEN MORGAN-MAPP, | : | |
| **Administratrix of the Estate of** | : | **CIVIL ACTION** |
| CASSANDRA MORGAN, Deceased, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| GEORGE W. HILL CORRECTIONAL | : | |
| FACILITY, et al., | : | **No. 07-2949** |
| Defendants. | : | |

**ORDER**

**AND NOW**, this **12th** day of **September, 2008**, after consideration of the Defendants'

motions for summary judgment, Plaintiff's responses thereto, Defendants' replies thereon and for

the following reasons, it is hereby **ORDERED** that:

1.     Plaintiff's claims brought pursuant to the Fourth, Fifth and Eighth Amendments are

**DISMISSED**.

2.     Defendants George W. Hill and Ronnie Moore are **DISMISSED** from this action.

3.     Plaintiff's corporate negligence claim against Defendant Crozer Chester Medical

Center is **DISMISSED**.

4.     Defendants Crozer Chester Medical Center and Usha Kotihal, M.D.'s Motion for

Summary Judgment (Document No. 59) is **DENIED**.

5.     Defendants Ronald Nardolillo, Ronnie Moore, Connie Danley, William Purner, M.D.

Grato Paneque, M.D., Hani Zaki, M.D. and John Fraunces, Ed.D's Motion for

Summary Judgment (Document No. 55) is **GRANTED in part** and **DENIED in**

**part** as follows:

a.     The motion is **GRANTED** as to Defendants Nardolillo and Danley.

b.     The motion is **DENIED** as to Defendants Purner, Paneque, Zaki, and

Fraunces.

6.     Defendants the GEO Group, Inc., George W. Hill, George W. Hill Correctional

Facility, the Delaware County Board of Prison Inspectors Motion for Summary

Judgment (Document No. 58) is **DENIED**.

7.     Defendant County of Delaware's Motion for Summary Judgment (Document No. 56)

is **GRANTED**.

8.     The County of Delaware is **DISMISSED** as a Defendant in this case.


                                        BY THE COURT:


                                        _____

                                        **Berle M. Schiller, J.**